IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRELL WILLIAMS (AIS #179642)   :

  Plaintiff,          :

vs.             :   CIVIL ACTION 08-00433-KD-N

BENJAMIN TAYLOR, et al.,     :

  Defendants.


REPORT AND RECOMMENDATION

  Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis filed a complaint under 42 U.S.C. § 1983.   This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the motions for summary judgment of Defendants Benjamin Taylor, John Morgan, James Gilheart, Mike Comalander, Timothy Kant, Nurse Gloria Jean Williams,[1] and Dr. Rolland Olds (Docs. 67, 69, 70, 72, 92, 126, 127, 135, 137, 138, 139, 143), and Plaintiff's Opposition thereto (Docs. 100, 128, 129, 142).   Plaintiff has also recently filed a Motion for Extension of Time to File Response (doc. 148), in which he requests that the court consider his late-filed Rebuttal brief (doc. 146).

  For the reasons set forth below, it is recommended that Defendants' motions for summary judgment be granted, that Plaintiff's constitutional claims (Doc. 132, Counts One through Five, Eleven, Eighteen, and Twenty) be dismissed with prejudice, and that Plaintiff's state law claims

---

1 Defendant Gloria Jean Williams disputes that she is the same person identified by Plaintiff in the complaint as Gloria Banks, the nurse who provided medical treatment to Plaintiff at Thomas Hospital on the morning of August 12, 2007.   (Doc. 135).   In any event, having found no constitutional violation in this case, Defendant Williams, also referred to as Defendant Banks, is entitled to judgment as a matter of law for the reasons set forth herein.

(Doc. 132, Counts Six through Ten, Twelve through Seventeen, Nineteen, and Twenty-one through Twenty-nine) be dismissed without prejudice.[2]   In addition, the court recommends that plaintiff's Motion for Extension of Time be granted; the undersigned has considered the plaintiff's untimely rebuttal brief in addressing the defendants' Motions for Summary Judgment. Having found no constitutional violation in this case, the undersigned recommends that the remaining pending motions (Docs. 97, 118, 122, 124, 125) be denied as moot.

## I.  SUMMARY OF FACTUAL ALLEGATIONS

From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report and Recommendation.   At approximately 3:30 a.m. on the morning of August 12, 2007, Plaintiff, driving a Camaro sports car, sped out of a driveway onto Highway 181 in Fairhope, Alabama.   (Doc. 132 at 5; Doc. 92 at 11; Doc. 70, att. 3 at 2). Officer Benjamin Taylor was traveling on Highway 181 in his patrol car and observed Plaintiff's high-speed entry onto the roadway.   (Doc. 70, att. 3 at 2).   Officer Taylor activated the blue lights on his patrol car, and Plaintiff pulled over into the parking lot of a local service station where another patrol car, occupied by Fairhope Police Officer John Morgan, was parked.   (Doc. 92 at 12-14; Doc. 132 at 5; Doc. 70, att. 3 at 3).   Plaintiff unbuckled his seat belt, rolled down the window, and proceeded to look for his license and car registration.   (Doc. 132 at 5).

Officer Taylor approached Plaintiff's vehicle at the driver's side door while Officer Morgan stood some distance behind.   (Id.).   Plaintiff and Officer Taylor knew one another from

                2 Defendant Thomas Hospital returned a waiver of service on July 12, 2011.   (Doc. 146).
Defendant Phillip Kousa, who is the Director of Thomas Hospital, and Defendant City of Fairhope have not
been served.   In any event, there being no constitutional violation in this case, these Defendants likewise
are entitled to judgment as a matter of law for the reasons set forth herein.

high school.[3]   (Doc. 92 at 8-9).   Plaintiff asked Officer Taylor why he pulled him over, and

Taylor responded that he had pulled Plaintiff over for reckless driving.   Officer Taylor told

Plaintiff that he had pulled out in front of another vehicle, causing the second vehicle to swerve to

avoid a collision.   (Doc. 132 at 5; Doc. 92 at 9, 15).   Plaintiff told Officer Taylor that he did not

see anyone when he pulled out and demanded to see the footage from the camera on Officer

Taylor's patrol car.   (Doc. 92 at 9-10, 15).   Plaintiff also informed Officer Taylor that he was

outside the corporate limits of the Fairhope Police Department and, therefore, Officer Taylor had

no jurisdiction over any traffic infractions committed by Plaintiff in the area.   (Id. at 13-14).

As Officer Taylor stood at the driver's side window, he smelled the odor of alcohol on

Plaintiff and observed one beer remaining out of a twelve-pack of beer in the car.   (Doc. 70, att. 3

at 3; Doc. 92 at 38).   Officer Taylor asked Plaintiff for his license and registration.   Officer

Taylor states that he then saw Plaintiff holding what appeared to be a plastic bag containing a

white substance, which he believed to be cocaine.   (Doc. 92 at 15-16; Doc. 70, att. 3 at 3).

Officer Taylor asked Plaintiff what he had in his hand, and Plaintiff responded, "the gear shift."

(Id.).   Officer Taylor states that he then saw Plaintiff suddenly appear to put the bag in his mouth,

and he "snatched [Plaintiff] around [his] neck" and pulled him from the car.   (Doc. 92 at 17; Doc.

70, att. 3 at 9).[4]   Plaintiff's sandal caught on the door of the car, and he and Officer Taylor fell to

the ground.   (Id.).   With his hands around Plaintiff's neck, Officer Taylor repeatedly shook

Plaintiff and yelled, "spit it out, spit it out."   (Id.).   Plaintiff tried unsuccessfully to keep his head

_____

3 In his sworn statement, Plaintiff refers to Officer Taylor as "Benji."   (Doc. 92 at 16, 19, 24, 34).
According to Plaintiff, he and Officer Taylor had never had any problems prior to this incident.   (Id. at 9).
4 As addressed in greater detail, *infra*, the evidence in the record is such that the court may find—even under the
strictures in addressing a motion for summary judgment—that Officer Taylor believed, in subjective good faith, that
he saw plaintiff put a plastic bag of white powder in his mouth.

from hitting the ground and finally responded, "spit what out?" (Id. at 17, 28, 32). Unable to retrieve anything from Plaintiff's mouth, Officer Taylor "snatched [Plaintiff] by the seat of [his] pants to get [him] up off the ground" and told Plaintiff to put his hands on the back of the car. (Id. at 18; Doc. 70, att. 3 at 9). Plaintiff walked around and put his hands on the car, and he and Officer Taylor began arguing back and forth.[5] (Id. at 33-35).

At that time, Sergeant James Gilheart arrived and asked Plaintiff what was going on.[6] Plaintiff told Sergeant Gilheart that he had not done anything wrong and that Officer Taylor had choked and assaulted him for no reason. (Id. at 19). Sergeant Gilheart and Officer Taylor then walked off and began talking. (Id.). Officer Taylor relayed to Sergeant Gilheart the events that had transpired, including his observation that he had seen drugs on Plaintiff, and he believed that Plaintiff had swallowed the drugs. (Doc. 70, att. 3 at 2; Doc. 70, att. 5 at 3).

According to Plaintiff, Sergeant Gilheart returned to where he was standing and commented that Plaintiff "look[ed] sick to [him] too," and said, "we're going to end this problem tonight." (Doc. 92 at 36-37). Sergeant Gilheart ordered Officer Taylor to take Plaintiff to the hospital. (Id. at 19; Doc. 70, att. 5 at 3). Officer Taylor put handcuffs on Plaintiff and placed him under arrest. (Doc. 92 at 37; Doc. 70, att. 3 at 3). Officer Taylor then put Plaintiff in his patrol car and drove five to ten minutes to the emergency room of Thomas Hospital. (Doc. 92 at 37; Doc. 70, att. 3 at 3; Doc. 132 at 6).

---

5 According to Plaintiff, at that point, Officer Taylor asked Officer Morgan if Morgan's patrol car camera was on, and Officer Morgan responded, "no." (Id. at 23). Officer Taylor then told Plaintiff, "You see, fucker, you out here all alone." (Id.). Notwithstanding Officer Taylor's comments, there was no further physical exchange between Plaintiff and Officer Taylor or any other police officer.

6 Plaintiff also knew Sergeant Gilheart. In his sworn statement, Plaintiff stated that "Cliff" (Gilheart) was a few years ahead of him in high school, and Sergeant Gilheart's mother taught Plaintiff in school. (Doc. 92 at 19).

Plaintiff arrived at Thomas Hospital at approximately 3:45 a.m. (Doc. 127, att. 11 at 3). At that time, a hospital staff member questioned Plaintiff extensively and then took him to an examination room where Defendants Taylor, Morgan, Gilheart, and Banks were waiting. (Doc. 132 at 6-7; Doc. 127, att. 11 at 3; Doc. 92 at 34, 39-40). According to Plaintiff, Officer Taylor told him, "[w]e can do this the easy way or the hard way, but you're going to give a blood and urine sample." (Doc. 92 at 39). Plaintiff responded that he was not giving his consent to anything. (Id.).

Nurse Gloria Banks was present in the examination room, and she connected Plaintiff to an EKG machine. (Doc. 132 at 6). Nurse Banks told Plaintiff that she did not have to have his cooperation because she could obtain a urine sample with a catheter. (Doc. 92 at 39). Plaintiff repeated that he was not giving his consent but that he would not physically resist. (Doc. 132 at 6). Nurse Banks extracted the blood and urine samples without resistance. (Id.; Doc. 142 at 2).

Subsequently, Dr. Rolland Olds entered the examination room and explained to Plaintiff that he was a medical doctor and that he understood from the notes recorded by the triage nurse that Plaintiff had possibly swallowed an unknown quantity of crack cocaine. (Doc. 127, att. 11 at 3-4; Doc. 72, att. 1 at 6). Dr. Olds explained to Plaintiff that, if he had swallowed a bag of drugs, it could rupture and lead to sudden death. (Id.; Doc. 92 at 40). Plaintiff responded that he had not swallowed any drugs and that he "was fine." (Doc. 92 at 40). Dr. Olds did not note any signs of trauma visible on Plaintiff.[7] (Doc. 127, att. 11 at 4). At 4:20 a.m., after Dr. Olds read the EKG report, he discharged Plaintiff against medical advice, and Plaintiff was taken to the Fairhope Jail.

---

[7] According to Plaintiff, his injuries "consisted of a lump on the back of his head, and minor scrapes and scratches from the asphalt." (Doc. 132 at 7). In addition, the right side of his face was "slightly enlarged" from "hitting the asphalt." (Id.).

(Doc. 92 at 40; Doc. 127, att. 11 at 4).

Upon arriving at the police station, Officer Taylor asked Plaintiff to take a breathalyzer, and Plaintiff's response was, "you've done everything else wrong. Are you even certified?" (Doc. 92 at 41). Sergeant Gilheart instructed Officer Taylor to indicate on the form that Plaintiff refused the breathalyzer. (Id.; Doc. 70, att. 3 at 9).

At approximately 5:08 a.m., Dr. Olds received the results from Plaintiff's urine test showing a positive result for cocaine, which he then reported to an officer with the Fairhope Police Department. (Doc. 127, att. 11 at 4). Dr. Olds informed the officer that Plaintiff needed to be closely monitored for any signs of sweating, vomiting, or belly pain, all of which could indicate the rupture of any bag of cocaine within Plaintiff's abdomen. (Id.). In such an event, Plaintiff was to be brought back to the emergency room immediately, or else he could die. (Id.).

Officer Taylor contacted Plaintiff's parole officer, and the parole officer faxed him a warrant for Plaintiff's detention for a parole violation. (Doc. 70, att. 3 at 3, 7; Doc. 70, att. 9 at 90-91; Doc. 92 at 43; Doc. 132 at 7). Plaintiff was charged with DUI, reckless driving, resisting arrest, and parole violation and transferred to the Baldwin County Corrections Center.[8] (Doc. 70, att. 3 at 3). On August 13, 2007, the day following his arrest, Plaintiff's parole officer performed a second urinalysis on Plaintiff which also tested positive for cocaine. (Doc. 70, att. 9 at 91). At his parole revocation hearing conducted on August 29, 2007, Plaintiff pled guilty to DUI, resisting arrest, reckless driving, and using cocaine while on parole, and his parole was revoked. (Doc. 70, att. 9 at 95-97).

_____

[8] The record shows that Plaintiff was on parole at the time of arrest, having been convicted in 1994 of first degree robbery for which he received a sentence of twenty years and having been convicted in 2002 for possession of cocaine for which he received a sentence of fifteen years. (Doc. 70, att. 9 at 90; Doc. 70, att. 8 at 78; Doc. 70, att. 7 at 20).

## II.  PROCEDURAL ASPECTS OF THE CASE

On July 24, 2008, Plaintiff filed the present § 1983 action.   (Doc. 1).   On July 31, 2008, the Court ordered Plaintiff to refile his complaint on this Court's form, which Plaintiff did on August 27, 2008.   (Docs. 4, 5).   Plaintiff amended his complaint on April 2, 2010 (Doc. 19), November 4, 2010 (Doc. 65) and June 1, 2011 (Doc. 132).   In the last amended complaint filed June 1, 2011, Plaintiff alleges that Defendants Officer Taylor, Officer Morgan, Sergeant Gilheart, Nurse Banks, and Dr. Olds deprived him of his constitutional rights by acting intentionally and/or in concert to commit unauthorized and unlawful arrests, to use excessive force, to commit assault and battery, to force medical treatment, and to illegally search and seize him in violation of the Fourth, Eighth, and Fourteenth Amendments (Counts One, Two, Three, and Five) (Doc. 132 at 9); that Defendants Chief of Police Mike Comalander and Mayor Tim Kant deprived him of his constitutional rights by maintaining a policy and practice of authorizing the cover up of the use of excessive force by the City of Fairhope police officers and by failing to adequately train and supervise the defendant police officers (Count Four); Defendants Taylor, Morgan, and Gilheart are liable under state law for intentional assault and battery (Counts Six and Seven) (id. at 11); Defendants Taylor, Morgan, and Gilheart are liable under state law for causing Plaintiff to suffer the intentional infliction of emotional distress (Counts Eight and Nine) (id. at 11-12); Defendant City of Fairhope is liable under the doctrine of respondeat superior for the state law intentional torts of Defendants Taylor, Morgan, and Gilheart (Count Ten) (id. at 12); Defendant City of Fairhope is liable through its agents, Defendants Taylor, Morgan, and Gilheart, for the use of excessive force (Count Eleven) (id. at 12); Defendants Taylor, Morgan, Gilheart are liable under state law for negligence arising out of Plaintiff's arrest (Counts Twelve, Thirteen) (id. at 12-13);

7

Defendants Comalander, Kant, and the City of Fairhope are liable under the doctrine of respondeat superior for the negligence of Defendants Taylor, Morgan, and Gilheart (Count Fourteen) (id. at 13); Defendant City of Fairhope is liable under state law for negligence, willfulness, and wantonness in failing to train and supervise Defendants Taylor, Morgan, and Gilheart (Counts Fifteen and Sixteen) (id. at 13-14); Defendants Taylor, Morgan, and Gilheart are liable under state law for abuse of process, false arrest, and false imprisonment (Count Seventeen) (id. at 14); Defendants Phillip Kousa[9] and Thomas Hospital deprived Plaintiff of his constitutional rights by maintaining a policy of authorizing their employees to work in concert with law enforcement officers to force unwanted and unnecessary medical treatment on persons in police custody and by failing to train or supervise their employees (Count Eighteen) (id. at 14); Defendant Thomas Hospital is liable under the doctrine of respondeat superior for the state law intentional torts of Defendants Banks and Olds (Count Nineteen) (id. at 15); Defendant Thomas Hospital, through its agents Defendants Banks and Olds, forced unwanted medical treatment on Plaintiff and committed unlawful searches and seizures (Count Twenty) (id. at 15); Defendants Banks and Olds are liable under state law for intentional assault and battery arising out of Plaintiff's forced medical treatment (Counts Twenty-one and Twenty-two) (id. at 16); Defendants Banks and Olds are liable under state law for intentional infliction of emotional distress arising out of Plaintiff's forced medical treatment (Counts Twenty-three and Twenty-four) (id. at 16); Defendants Banks and Olds are liable under state law for negligence arising out of Plaintiff's forced medical treatment (Counts

_____

9 On May 19, 2010, the Court screened Plaintiff's complaint under 28 U.S.C. § 1915(e)(2)(B)(i) and (ii) and dismissed Plaintiff's claims against Defendant Kousa, without prejudice, as frivolous and for failing to state a claim upon which relief could be granted. (Docs. 21, 22 at 9). On June 14, 2011, the Court allowed Plaintiff to amend his complaint to include the current claims against Defendant Kousa arising out of Plaintiff's forced medical treatment at Thomas Hospital. (Docs. 131, 133).

Twenty-five and Twenty-six) (id. at 17); based on the doctrine of respondeat superior, Defendants

Kousa and Thomas Hospital are liable under state law for the negligence of Defendants Banks and

Olds arising out of Plaintiff's forced medical treatment (Count Twenty-seven) (id. at 17); and

Defendant Thomas Hospital is liable for its negligence under state law for failure to train and

supervise Defendants Banks and Olds arising out of Plaintiff's forced medical treatment (Counts

Twenty-eight and Twenty-nine) (id. at 18). Plaintiff seeks compensatory and punitive damages,

as well as injunctive relief. (Id. at 23-24).

In the Special Reports and Answers filed by Defendants Taylor, Morgan, Gilheart,

Comalander, Kant, and Olds on November 12, 2010, and March 18, 2011, Defendants deny

Plaintiff's allegations and assert various defenses and immunities.[10] (Docs. 67, 69, 126, 127).

---

[10] Plaintiff has sued Defendants in their official and individual capacities. Plaintiff's claims against Defendants Taylor, Morgan, Gilheart, Comalander, and Kant in their official capacities are treated as claims against the City of Fairhope. See Hardy v. Town of Hayneville, 50 F. Supp. 2d 1176, 1184-85 (M.D. Ala. 1999) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (quoting Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)). "There is no longer a need to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages and injunctive or declaratory relief." Id. (quoting Graham, 473 U.S. at 167 n.14). Thus, Plaintiff's § 1983 claims against Defendants Taylor, Morgan, Gilheart, Comalander, and Kant in their *official* capacities are due to be dismissed on this basis.

Moreover, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). The Court addresses this issue separately in its discussion of Plaintiff's Fourth Amendment claims.

Last, the Court notes that Eleventh Amendment immunity, which bars suit in federal court against a state and state officers, does not apply to municipalities, counties, or other political subdivisions of the state. See Robinson v. Georgia Dep't of Transp., 966 F.2d 637, 638 (11th Cir. 1992); Storer Cable Commc'ns v. City of Montgomery, Ala., 806 F. Supp. 1518, 1530 (M.D. Ala. 1992) ("eleventh-amendment immunity does not apply to municipalities or their officials, such as the City of Montgomery and the city's mayor."). Moreover, neither Eleventh Amendment immunity nor qualified immunity extends to the

Plaintiff filed responses in opposition to Defendants' Special Reports on February 4, 2011, and April 4, 2011. (Docs. 100, 129). On June 22, 2011, the Court ordered that Defendants' Special Reports and Answers be treated as motions for summary judgment. (Doc. 140).

On June 14, 2011, June 21, 2011, and June 29, 2011, Defendants Banks, Olds, Taylor, Morgan, Gilheart, Comalander, and Kant filed motions to dismiss. (Docs. 135, 137, 138, 143). Plaintiff filed a response in opposition to Defendant Banks' Motion to Dismiss on June 27, 2011. (Doc. 142). On June 30, 2011, the Court converted the Defendants' motions to dismiss to motions for summary judgment. (Doc. 144). On August 2, 2011, Plaintiff filed an additional response to Defendants' motions for summary judgment. (Doc. 147). Defendants' motions for summary judgment, and Plaintiff's responses thereto, are now before the Court.

## III. SUMMARY JUDGMENT STANDARD

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment. It is well established that summary judgment is proper under Federal Rule of Civil Procedure 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, all of the evidence and factual inferences reasonably

---

private medical defendants in this case. See Hinson v. Edmond, 205 F.3d 1264, 1265 (11th Cir. 2000) (privately employed prison physician is ineligible to advance the defense of qualified immunity); Scott v. Patterson, 2011 WL 902104, *3 n.5 (S.D. Ala. 2011) (neither qualified nor Eleventh Amendment immunity applies to privately employed prison nurse); see also Harrison v. Ash, 539 F.3d 510, 525 (6th Cir. 2008) (privately employed prison nurses "are not eligible for qualified immunity in a § 1983 suit.") (citing cases).

drawn from the evidence must be viewed in the light most favorable to the nonmoving party.[11]

Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Jackson v. BellSouth Telecomms., 372

F.3d 1250, 1280 (11th Cir. 2004).

Federal Rule of Civil Procedure 56(e) provides:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> > (1) give an opportunity to properly support or address the fact;
> > (2) consider the fact undisputed for purposes of the motion;
> > (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
> > (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

Summary judgment is proper when, "after an adequate time for discovery, a party fails to

make a showing sufficient to establish the existence of an essential element of that party's case."

McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal quotation marks

omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is

not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted). Summary judgment should be

granted "where a party 'fails to make a showing sufficient to establish the existence of an element

---

11 The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000) (citations and internal quotation marks omitted). Nevertheless, for summary judgment purposes, the Court's analysis begins with a description of the facts in the light most favorable to the nonmoving party. McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009).

essential to that party's case, and on which that party will bear the burden of proof at trial.'"

Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

## IV.   DISCUSSION

As set forth above, Plaintiff seeks redress pursuant to 42 U.S.C. § 1983 for alleged constitutional deprivations arising out of his arrest and subsequent forced medical treatment at Thomas Hospital on August 12, 2007.   Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (1994).   For the reasons set forth below, the Court finds that Plaintiff's allegations fail to establish any constitutional violation by Defendants.   Therefore, it is recommended that Defendants' motions for summary judgment be granted on Plaintiff's constitutional claims.

A.   Fourth Amendment - Unlawful Arrest.

In his complaint, Plaintiff claims that Defendants Taylor, Morgan, and Gilheart violated his constitutional rights by unlawfully arresting him without probable cause.   (Doc. 132 at 7-9, 14).   Although Plaintiff alleges violations of the Fourth, Eighth, and Fourteenth Amendments, this claim is properly characterized as a Fourth Amendment claim.   See Jones v. Pandey, 390 F. Supp. 2d 1371, 1376 (M.D. Ga. 2005) ("Plaintiff states that his unlawful arrest claim violates the Fourteenth Amendment.   While true in the simplest sense, the claim must be analyzed under the

Fourth Amendment's § 1983 jurisprudence.").

In response to Plaintiff's complaint, Defendants deny that Plaintiff was unlawfully arrested and assert, further, that they are entitled to qualified immunity. As noted above, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal quotation marks and citations omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, . . . protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Id. at 1194 (internal quotation marks and citations omitted).

"In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Id. (internal quotation marks and citations omitted). Here, it is clear that Defendants Taylor, Morgan, and Gilheart were acting within the course and scope of their discretionary authority as police officers in effecting Plaintiff's arrest. See Burnett v. Unified Gov't of Athens-Clarke County, Ga., 395 Fed. Appx. 567, 568 (11th Cir. 2010) (unpublished)[12] ("'[T]here can be no doubt that [the defendant police officer] was acting in his discretionary capacity when he arrested' the plaintiff.") (citations omitted).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee, 284 F.3d at

_____

12 "Pursuant to Eleventh Circuit Rule 36-2, unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." Lanier Constr., Inc. v. Carbone Props. of Mobile, LLC, 253 Fed. Appx. 861, 865 n.5 (11th Cir. 2007) (unpublished).

1194.   "A court required to rule upon the qualified immunity issue must consider, then, this

threshold question: Taken in the light most favorable to the party asserting the injury, do the facts

alleged show the officer's conduct violated a constitutional right?"   Saucier v. Katz, 533 U.S. 194,

201 (2001), overruled in part, Pearson v. Callahan, 555 U.S. 223, 233, 129 S. Ct. 808, 818 (2009);

Hope v. Pelzer, 536 U.S. 730, 736 (2002).   If no constitutional right was violated, the court need

not inquire further.   Saucier, 533 U.S. at 201.   If, however, a constitutional violation occurred,

the court must then determine whether the right was clearly established.[13]   Id.

Turning now to Plaintiff unlawful arrest claim, "[u]nder the Fourth Amendment, an

individual has a right to be free from 'unreasonable searches and seizures'. . . . [and] an arrest is a

seizure of the person."   Case v. Eslinger, 555 F.3d 1317, 1326 (11th Cir. 2009) (citations omitted).

"The 'reasonableness' of a seizure or arrest under the Fourth Amendment turns on the presence or

absence of probable cause."   Id.

"A warrantless arrest without probable cause violates the Constitution and provides a basis

for a section 1983 claim [,] but [t]he existence of probable cause at the time of arrest . . . constitutes

an absolute bar to a section 1983 action for false arrest."   Id. at 1326-27 (citations and internal

quotation marks omitted).   "'Probable cause to arrest exists when law enforcement officials have

facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the

suspect had committed or was committing a crime.'"   Id. at 1327 (citations omitted).

"[P]robable cause requires only a probability or substantial chance of criminal activity, not an

actual showing of such activity."   Id. (quoting Illinois v. Gates, 462 U.S. 213, 245 n.13 (1983)).

"Even 'seemingly innocent activity' can be the basis for probable cause."   Id. (citations omitted).

---

13 The sequential order in which the court addresses the two prongs of the Saucier analysis is left to
the court's sound discretion in light of the circumstances in the particular case at hand.   See Pearson, 555
U.S. at 233, 129 S. Ct. at 818.

"Probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'"   Id. (citations omitted).

"[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."   Maryland v. Pringle, 540 U.S. 366, 370 (2003) (citations and internal quotation marks omitted).   "[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt."   Id. (citations omitted).

Moreover, even if it is determined that a constitutional violation occurred because an officer lacked probable cause, the Court will then consider whether arguable probable cause existed.   "The officer may still be shielded from liability because his actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.   Case, 555 F.3d at 1327 (quoting Hope, 536 U.S. at 739) (internal quotation marks omitted).   "It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials -- like other officials who act in ways they reasonably believe to be lawful -- should not be held personally liable."   Anderson v. Creighton, 483 U.S. 635, 641 (1987).   Thus, even if it is determined that the arresting officers in this case did not in fact have probable cause, the standard to be applied is whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] *could have believed* that probable cause existed to arrest."   Lee, 284 F.3d at 1195 (citations omitted) (emphasis added).

As discussed above, the undisputed evidence shows that Officer Taylor observed Plaintiff pull out of a driveway onto a highway at 3:30 a.m. in a Camaro sports car at a "fast rate of speed."[14]

_____

14 According to Plaintiff, he was pulling out of a driveway belonging to an individual whom he

(Doc. 70, att. 3 at 2).   Officer Taylor activated his blue lights, and Plaintiff pulled over.   (Doc. 92 at 12-13).   When Officer Taylor approached the driver's side door, he smelled alcohol on Plaintiff and observed one beer remaining out of a twelve-pack of beer in the car.[15]   (Doc. 70, att. 3 at 3; Doc. 92 at 38).   Officer Taylor told Plaintiff that he was driving recklessly and almost struck another vehicle when he pulled onto the highway.   (Doc. 92 at 9, 15, 44).   Plaintiff denied the accusation and demanded to see the video from Officer Taylor's patrol car.   (Id.).   After Officer Taylor asked Plaintiff for his license and registration, he saw Plaintiff holding what he believed to be a plastic bag of cocaine in his right hand.   (Doc. 92 at 15-16; Doc. 70, att. 3 at 3).   He asked Plaintiff what he had in his hand, and Plaintiff responded, "the gear shift."   (Id.).   Officer Taylor then observed Plaintiff suddenly appear to put the bag in his mouth.   (Doc. 70, att. 3 at 3, 9).   Officer Taylor pulled Plaintiff from the car, grabbed him around the neck, fell to the ground, and repeatedly shook him, yelling "spit it out, spit it out."   (Doc. 92 at 16-17).   Unable to retrieve anything from Plaintiff's mouth, Officer Taylor pulled Plaintiff up by the seat of his pants and told him to stand with his hands on the back of the car.   (Id. at 18, 32-33).   At that time, Officer Taylor's supervisor, Sergeant Gilheart, arrived on the scene, and Officer Taylor told Sergeant Gilheart that Plaintiff had just swallowed a bag of drugs.   (Doc. 70, att. 3 at 2-3; Doc. 70, att. 5 at 3).   Sergeant Gilheart instructed Officer Taylor to take Plaintiff to the emergency room.   (Doc. 70, att. 5 at 3; Doc. 92 at 33, 37).   Officer Taylor handcuffed Plaintiff, placed him under arrest, and transported him to Thomas Hospital.   (Doc. 92 at 33, 37).   Thereafter, Plaintiff was taken to the Fairhope Jail and charged with reckless driving, DUI, resisting arrest, and probation violation.

---

had met that night.   (Doc. 92 at 11-12).   Although he denies that he almost collided with another vehicle when he pulled onto the highway, he does not deny that he was traveling at a high rate of speed.   (Doc. 100 at 5).

[15] Plaintiff admits that there was beer in his car, although he disputes that he was drinking it. (Doc. 92 at 38).

(Doc. 70, att. 3 at 6).

Considering the totality of circumstances presented in this case, Plaintiff's claim for unlawful arrest fails as a matter of law because Defendants Taylor, Morgan, and Gilheart, at a minimum, had arguable probable cause to arrest Plaintiff for reckless driving[16], driving under the influence, and parole violation. "If the arresting officer had arguable probable cause to arrest for *any* offense, qualified immunity will apply." Burnett, 395 Fed. Appx. at 569 (emphasis added) (citations omitted); Bailey v. Board of County Comm'rs of Alachua County Florida, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992) ("The validity of an arrest does not turn on the offense announced by the officer at the time of the arrest."); Whittington v. Town of Surfside, 490 F. Supp. 2d 1239, 1251 (S.D. Fla. 2007) ("so long as probable cause existed to arrest Plaintiff for any offense, the arrest and detention are valid even if probable cause was lacking as to some offenses, or even all announced charges.").

Alabama Code § 32-5A-190 defines "reckless driving" as follows: "Any person who drives any vehicle carelessly and heedlessly in willful or wanton disregard for the rights or safety of persons or property, or without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property, shall be guilty of reckless driving."

> This statute divides the offense of reckless driving into two alternatives. See White v. State, 37 Ala. App. 424, 69 So. 2d 874, 875 (1953). The first alternative prohibits driving a vehicle "carelessly and heedlessly in willful or wanton disregard for the rights or safety of persons or property." Ala. Code § 32-5A-190(a). The second alternative prohibits driving "without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property." Id.
>
> Under Alabama law, the phrase "without due caution and circumspection" means "no more than negligence." Kirk v. State,

---

[16] At his parole revocation hearing, Plaintiff pled guilty to DUI, resisting arrest, reckless driving and using cocaine while on parole. The fact of his reckless driving, witnessed by Officer Taylor, is thus res judicata and is uncontested.

> 35 Ala. App. 405, 47 So. 2d 283, 285 (1950). Wood thus may be
> guilty of reckless driving by driving negligently and at a speed or in
> a manner likely to endanger any person or property. Id.; Ala. Code
> § 32-5A-190(a).

Wood v. Kesler, 323 F.3d 872, 878-79 (11th Cir. 2003) (officer had actual probable cause to arrest

driver for reckless driving where he "was speeding in a large tractor truck in an area of hazardous

conditions on an interstate highway.").

In the present case, a reasonable police officer *could have believed* that probable cause

existed to arrest Plaintiff for reckless driving after observing Plaintiff enter the highway from a

driveway at a "fast rate of speed" in a Camaro sports car at 3:30 a.m.[17] See id., 323 F.3d at 879

(driving negligently and at a speed or in a manner likely to endanger any person or property

constitutes reckless driving.). The facts that Plaintiff smelled of alcohol and had an almost-empty

twelve-pack of beer in his car further add to the reasonableness of Officer Taylor's belief that he

had probable cause to arrest Plaintiff for this offense.[18]

In addition, Alabama Code § 32-5A-191 defines "driving under the influence" ("DUI") as:

> (a) A person shall not drive or be in actual physical control of any
> vehicle while:
>> (1) There is 0.08 percent or more by weight of alcohol in his
>> or her blood;
>> (2) Under the influence of alcohol;
>> (3) Under the influence of a controlled substance to a degree
>> which renders him or her incapable of safely driving;
>> (4) Under the combined influence of alcohol and a
>> controlled substance to a degree which renders him or her
>> incapable of safely driving; or
>> (5) Under the influence of any substance which impairs the

---

17 The Court does not consider Officer Taylor's disputed testimony that Plaintiff almost collided with another vehicle when he pulled out. (Doc. 92 at 9, 15).

18 Plaintiff challenges the legality of the arrest, not the traffic stop itself. If he did challenge the traffic stop, however, any such claim would fail given Officer Taylor's arguable probable cause to stop Plaintiff for speeding or reckless driving after he entered the highway from a driveway at a high rate of speed. See DeRosa v. Rambosk, 732 F. Supp. 2d 1285, 1293 (M.D. Fla. 2010) ("[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred") (citations omitted).

mental or physical faculties of such person to a degree which
renders him or her incapable of safely driving.

After Officer Taylor informed Sergeant Gilheart that he had just observed Plaintiff appear to swallow a bag of cocaine, Sergeant Gilheart ordered Officer Taylor to transport Plaintiff directly to the emergency room at Thomas Hospital. Although Officer Taylor did not conduct field sobriety tests to assess Plaintiff's level of intoxication, if any, Officer Taylor's failure to do so was reasonable given the urgency of the situation. In any event, Officer Taylor did smell alcohol on Plaintiff; he observed an almost-empty twelve-pack of beer in Plaintiff's car; he observed Plaintiff driving recklessly; and he observed Plaintiff appear to swallow a bag of cocaine while in actual physical control of a vehicle. Based on these facts, a reasonable police officer *could have believed* that probable cause existed to arrest Plaintiff for driving under the influence.

Furthermore, it is undisputed that Officer Taylor was aware that Plaintiff was on parole.[19] (Doc. 92 at 31). Given Officer Taylor's observation of Plaintiff's reckless driving, his driving under the influence, and his possession of what appeared to cocaine, a reasonable police officer *could have believed* that he had probable cause to arrest Plaintiff for a parole violation. See U.S. v. Gunn, 428 F.2d 1057, 1060 (5th Cir. 1970)[20] (officers had *actual* probable cause to arrest parolee on a parole violation where they knew that she was on parole, parolee's vehicle was improperly tagged, and officers observed a credit card in plain view that was not issued to parolee, as well as property that appeared to match items purchased with a stolen credit card). Indeed, upon arriving at the jail, Officer Taylor made contact with Plaintiff's parole officer, and the parole officer immediately issued an "Authorization of Arrest" for Plaintiff's parole violations. (Doc.

---

19 Prior to Officer Taylor placing him under arrest, Plaintiff told Officer Taylor, "it's probably a blessing to both of us that I'm on parole because I would have been a whole lot more aggressive with resisting." (Doc. 92 at 31).

20 In Bonner v. City of Prichard, 661 F.2d 1206, 1209-10 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted the rulings of the old Fifth Circuit (pre-October 1, 1981) as binding precedent.

70, att. 9 at 90).

Finally, although Plaintiff was not arrested for possession of cocaine, the Court finds that Officer Taylor also had arguable probable cause to arrest him on that basis.   Alabama Code § 13A-12-212 provides: "(a) A person commits the crime of unlawful possession of controlled substance if . . . he possesses a controlled substance enumerated in Schedules I through V." "Cocaine is a controlled substance enumerated in schedules I through V."   Whatley v. State, 586 So. 2d 966, 967 (Ala. Crim. App. 1991).

In his affidavit, Officer Taylor states:

> I saw a plastic bag in Williams' right hand containing a white substance, which I believed to be cocaine based on my experience as an officer.   I asked Williams for his information and I opened Williams' car door.   I asked Williams what he had in his right hand and he suddenly swallowed the bag of what I believed to be was drugs.   I attempted to remove Williams from his vehicle and tried to get him to spit out what he had swallowed.   When Sergeant Gilheart arrived at the scene, I told him what had occurred.

(Doc. 70, att. 3 at 3).   In addition, the arrest report states:

> When I walked up to the driver's side of the vehicle and (sic) saw a plastic baggie of white substance which appeared to be cocaine in the driver's right hand.   I got the subject's information and then opened the door.   When I reached towards the subject he put the plastic bag of white substance in his mouth.   I tried to get the substance from the subject by taking the subject to the ground and wrestling with him but was unable to.   There was beer in vehicle and subject had been drinking.   Subject would not cooperate for sobriety test Draeger.   Urine and blood was taken at hospital.

(Doc. 70, att. 3 at 9).

Although Plaintiff disputes that he was in possession of a bag of cocaine, he does not dispute that Officer Taylor *believed that he saw* Plaintiff holding a bag of cocaine which he put in his mouth and swallowed.   Plaintiff claims that Officer Taylor threatened to have his stomach pumped, telling him, "I know you swallowed drugs…."   (Doc. 92 at 19).   Officer Taylor then

told Plaintiff that he had "disrespected" him by "swallowing [the] drug evidence." (Id. at 35). Plaintiff concedes in his sworn statement: "… I was thinking about the entire event, because at the end of it I understood why [Officer Taylor] had done what he done. He said, You had drugs on you. That's why I choked you out, or whatever." (Id. at 44). In addition, Officer Taylor's actions in grabbing Plaintiff around the neck, shaking him repeatedly, screaming, "spit it out, spit it out," evidence Officer Taylor's good faith belief that he saw Plaintiff swallow a bag of cocaine.[21]

Assuming that Officer Taylor's belief that Plaintiff was in possession of cocaine was mistaken, the Court finds that it was objectively reasonable in light of all of the circumstances. Again, while Plaintiff disputes that he was in possession of cocaine, he does not dispute that he suddenly appeared to put something in his mouth after Officer Taylor asked him what he had in his hand. (Doc. 100 at 5). Moreover, when Officer Taylor told Plaintiff that he had disrespected him by swallowing the "drug evidence" (Doc. 92 at 35), Plaintiff responded, "there wasn't no damn drugs," but "no one is going to give a police officer drugs *if it was drugs*. I don't give a damn who you are." (Id.) (emphasis added). Plaintiff's "if it was drugs" remark could have given a reasonable officer the impression that what he had seen was in fact cocaine and that Plaintiff had swallowed the drugs to prevent being caught, particularly since he was on parole.[22] Based on all of the circumstances presented, a reasonable officer *could have believed* that Plaintiff was in possession of cocaine. Thus, Officer Taylor had arguable probable cause to arrest Plaintiff on that basis as well. Lee, 284 F.3d at 1195.

---

21 As discussed above, "[o]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause . . . and in those situations courts will not hold that they have violated the Constitution." Saucier, 533 U.S. at 206.

22 In 2002, Plaintiff had been arrested by another officer with the Fairhope Police Department and was convicted of possession of cocaine. (Doc. 70, att. 9 at 90; Doc. 70, att. 8 at 78; Doc. 70, att. 7 at 20). While it is unclear whether Officer Taylor knew that Plaintiff had been convicted of cocaine possession, he clearly knew that Plaintiff was on parole.

Qualified immunity is intended to protect from suit "all but the plainly incompetent or one who is knowingly violating the federal law," <u>Lee</u>, 284 F.3d at 1193-94 (internal quotation marks and citations omitted), and it is the *Plaintiff* who "bear[s] the burden of proving qualified immunity does not apply." <u>Daniels v. City of Hartford, Ala.</u>, 645 F. Supp. 2d 1036, 1051 (M.D. Ala. 2009) (citing <u>Rankin v. Evans</u>, 133 F.3d at 1425, 1436 (11th Cir. 1998); <u>Evans v. Hightower</u>, 117 F.3d 1318, 1320 (11th Cir. 1997); <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115-17 (11th Cir. 1993)). Plaintiff "must prove both that actual probable cause did not exist, and that arguable probable cause did not exist." <u>Id.</u>

Having considered all of the circumstances of this case, the Court is satisfied that Plaintiff has failed to prove that a reasonable officer possessing the same knowledge as Officer Taylor could not have believed that probable cause existed to arrest Plaintiff for at least one of the charges discussed above. For each of the foregoing reasons, the Court finds that Officer Taylor, Officer Morgan, and Sergeant Gilheart had arguable probable cause to effect Plaintiff's arrest. Accordingly, they are entitled to qualified immunity on Plaintiff's unlawful arrest claims.

B. <u>Fourth Amendment - Excessive Force During Arrest</u>.

In his complaint, Plaintiff also claims that Defendants Taylor, Morgan, and Gilheart used excessive force against him in effecting his arrest. (Doc. 132 at 5-6, 8-9). Plaintiff claims that Officer Taylor used excessive force against him when trying to retrieve the drugs that he believed Plaintiff had in his mouth and that Officer Morgan stood by and failed to prevent Officer Taylor's use of force. (<u>Id.</u> at 5-6). Plaintiff makes no allegations of excessive force by Sergeant Gilheart.

The facts related to Plaintiff's arrest and the use of force by Officer Taylor attempting to retrieve what he believed to be a bag of cocaine from Plaintiff's mouth have been discussed at length above and will not be repeated here. Construing the facts in the light most favorable to

Plaintiff, Office Taylor used, at most, minimal force, which will not support an excessive force claim.

In a similar case, <u>Woodruff v. City of Trussville</u>, 2011 WL 2847585, *2 (11th Cir. 2011) (unpublished), the Eleventh Circuit recently held: "[t]he application of de minimis force, without more, will not support an excessive force claim and will not defeat an officer's qualified immunity." <u>Id.</u> (quoting <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1257-58 (11th Cir. 2000) (internal quotation marks omitted)). In <u>Woodruff</u>, the plaintiff raised claims of unlawful arrest, excessive force, and malicious prosecution in violation of the Fourth Amendment against the City of Trussville and two police officers stemming from a traffic stop. The plaintiff alleged that one of the officers "punched him in the face, pulled him from his car, threw him to the pavement, causing him to strike his head, and handcuffed him without telling him the nature of the charges for which he was under arrest." <u>Id.</u> at *1. The Eleventh Circuit affirmed the district court's order granting summary judgment in favor of the defendants on each of the plaintiff's claims, stating:

> The kind of force alleged by Woodruff—including Adams punching Woodruff in the face, forcefully removing him from his car, and slamming him on the ground—even when construed in the light most favorable to Woodruff, constituted only de minimis force. [<u>Nolin v. Isbell</u>, 207 F.3d 1253, 1257-58 (11th Cir. 2000)] (concluding that only de minimis force was used when officer grabbed the plaintiff, shoved him a few feet against a vehicle, pushed his knee into plaintiff's back, pushed plaintiff's head against the van, searched plaintiff's groin area in an uncomfortable manner, and placed plaintiff in handcuffs, all resulting in only minor bruising).

<u>Woodruff</u>, 2011 WL 2847585, *2.

In the present case, Plaintiff alleges force similar to that used in <u>Woodruff</u>, and there is no evidence that Plaintiff suffered anything other than *de minimis* injury as a result of the physical altercation with Officer Taylor. In his complaint, Plaintiff alleges that he "was fine other than the

bruises obtained incident to the officer's conduct" and that his "injuries consisted of a lump on the back of his head, and minor scrapes and scratches from the asphalt."  (Doc. 132 at 7).   In addition, the right side of his face was "slightly enlarged from hitting the asphalt."  (Id.).   When taken to the hospital immediately following his arrest, Plaintiff insisted that he was "fine," and Dr. Olds confirmed that "at no point during [his] interaction with Mr. Williams did [he] note any signs of trauma."  (Doc. 92 at 40; Doc. 127, att. 11 at 4).

Moreover, in his sworn statement, Plaintiff made light of the struggle with Officer Taylor, stating:

> [W]hen Benji asked me, he asked me, said, What do you have in your hand?  I said, the gear shift, because I had my hand – It's a Camaro, so my hand was on the gear shift in the middle.   I said, the gear shift.   And we went from the gear shift to him swinging the door open and grabbing me around my throat.
>
> I had sandals on, and you know how low a Camaro is to the ground.   It's low to the ground.   So when he snatched me around my neck, he was like, Spit it out, spit it out.   And I was looking at him, and my feet grabbed the lip of the door frame of the car, and that's when I went to the ground.   He kept ch[o]king me saying, Spit it out, spit it out.   And I finally said, Spit what out?
>
> I kind of thought it was funny.   And I said, This is a damn idiot."

(Doc. 92 at 16-17).

Viewing the facts in the light most favorable to the Plaintiff, the force used by Officer Taylor was nothing more than *de minimis*.   There being no constitutional violation, Defendants Taylor, Morgan, and Gilheart are entitled to summary judgment on Plaintiff's claim for excessive force arising out of his arrest.

C.  Fourth Amendment - Excessive Force/Unlawful Search and Seizure at Hospital.

In his complaint, Plaintiff also claims that Officer Taylor, Officer Morgan, Sergeant Gilheart, Nurse Banks, and Dr. Olds violated his rights under the Fourth, Eighth, and Fourteenth

Amendments by forcing him to give blood and urine samples at the hospital. Plaintiff claims that Defendants' actions constituted an unlawful search and seizure, as well as the use of excessive force. (Doc. 132 at 6-9). These claims, like Plaintiff's claims for unlawful arrest, are properly analyzed under the Fourth Amendment.[23]

Turning, first, to Plaintiff's unlawful search and seizure claim, the Court considers whether the blood and urine samples taken by Nurse Banks at the hospital were for diagnostic purposes (given that Plaintiff had reportedly swallowed a bag of cocaine) or for investigative purposes. As discussed above, the evidence shows that, after pulling Plaintiff over for reckless driving, Officer Taylor believed that he saw Plaintiff swallow a bag of cocaine. Officer Taylor reported this to his supervisor, Sergeant Gilheart, who ordered him to take Plaintiff directly to the emergency room. Officer Taylor placed Plaintiff under arrest and drove to Thomas Hospital, arriving at approximately 3:45 a.m. Once at the emergency room, a hospital staff member questioned Plaintiff extensively and then took him to an examination room where Defendants Taylor, Morgan, Gilheart, and Banks were waiting. (Doc. 132 at 6-7; Doc. 127, att. 11 at 3; Doc. 92 at 34, 39-40). Nurse Banks connected Plaintiff to an EKG machine, and Officer Taylor told Plaintiff, "[w]e can do this the easy way or the hard way, but you're going to give a blood and urine sample." (Doc. 92 at 39). Plaintiff refused, and Nurse Banks told him that she could extract a urine sample with a catheter even without his cooperation. (Id.). Plaintiff repeated that he was not giving his consent but stated that he would not physically resist. (Id.; Doc. 132 at 6). Nurse Banks

---

23 The Fourth Amendment guarantees that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment. . . ." Graham v. Connor, 490 U.S. 386, 394 (U.S. 1989); accord Jones, 390 F. Supp. 2d at 1376.

obtained the blood and urine samples.   (Id.; Doc. 142 at 2).

At approximately 4:20 a.m., Dr. Olds entered the examination room and explained to Plaintiff that he was a medical doctor, that he understood that Plaintiff had possibly swallowed an unknown quantity of cocaine in a bag, and that if the bag ruptured, it could lead to sudden death. (Doc. 127, att. 11 at 3-4; Doc. 72, att. 1 at 6; Doc. 92 at 40).   Plaintiff denied swallowing any drugs, stated that he "was fine," and refused all medical treatment.   (Doc. 92 at 40).   After reading the EKG report and confirming that Plaintiff understood the risks but would not consent to treatment despite being advised that he could die, Dr. Olds discharged Plaintiff against medical advice.   (Doc. 127, att. 11 at 4).   Plaintiff was taken to the Fairhope Jail.   (Doc. 92 at 40).

At approximately 5:08 a.m., Dr. Olds received the results of the urine test, which proved positive for cocaine, and he reported the results by telephone to an officer with the Fairhope Police Department.[24]   (Doc. 127, att. 11 at 4).   Dr. Olds stressed to the officer that Plaintiff needed to be monitored closely for signs of sweating, vomiting, or belly pain, all of which could evidence the rupture of a bag of cocaine, if any, in his abdomen.   (Id.).   Dr. Olds instructed the officer that, in such event, Plaintiff needed to be brought to the emergency room immediately, as he could die. (Id.).

Having considered all of the specific circumstances of this case, the Court finds that Officer Taylor had a legitimate, non-investigatory reason for transporting Plaintiff to the hospital and requiring Plaintiff to cooperate with medical personnel to determine if the bag of cocaine that Officer Taylor believed that Plaintiff had swallowed had ruptured.   In his affidavit, Dr. Olds confirmed the medical necessity of the blood and urine tests, apart from any investigatory purpose, stating:

---

24 Dr. Olds could not remember the name of the police officer with whom he spoke.   (Doc. 127, att. 11 at 4).

> On August 12, 2007, Mr. Darrell Williams presented in police
> custody to the Thomas Hospital emergency department at or around
> 3:45 a.m.   His chief complaint, as recorded by the triage nurse, was
> "poss. swallowed crack cocaine."   The triage nurse, at some point
> shortly after 3:50 a.m., recorded Mr. Williams vitals, and procured a
> blood and urine sample in light of his chief complaint.
>
> As the ingestion of an unknown quantity o[f] crack cocaine can lead
> to sudden death, all of the nursing measures mentioned above were
> medically appropriate, and necessary for the safety, well-being, and
> benefit of the patient, Mr. Darrell Williams.   It was also entirely
> prudent of the law enforcement personnel to immediately bring Mr.
> Williams to the emergency department in light of his suspected
> ingestion of crack cocaine.

(Doc. 127, att. 11 at 3) (paragraph numbers omitted).

In addition to the testimony of Dr. Olds concerning the medical necessity of the blood and urine tests, it is not lost on this Court that Officer Taylor could have been subject to civil liability if he had not sought emergency medical attention for Plaintiff but had simply taken him to jail and locked him in a cell after observing him appear to ingest a bag of cocaine.   Under the circumstances of this case, Officer Taylor's conduct, as well as that of Defendants Morgan, Gilheart, Banks, and Olds, was reasonable and did not violate the Fourth Amendment.

Moreover, even if the Court were to assume that the blood and urine tests conducted at the hospital were performed strictly for investigative purposes, the circumstances of this case justify Defendants' warrantless search and seizure under the doctrine of exigent circumstances.   Under this doctrine, a warrantless search incident to an arrest based on probable cause is justified where an officer reasonably believes that he is "confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threaten[s] the destruction of evidence." Schmerber v. California, 384 U.S. 757, 770 (1996) (citations and internal quotation marks omitted).

In Schmerber, 384 757, 758 (1966), the petitioner was taken to the hospital for medical

treatment for injuries he sustained in a car accident and was arrested at the hospital for driving under the influence.   Despite the petitioner's refusal to give his consent for the hospital staff to take a blood sample, a police officer directed a physician to withdraw the blood.   The results of the blood test indicated intoxication and were subsequently used to convict the petitioner in state court of driving under the influence.   Petitioner claimed that the taking of his blood without his consent violated his Fourth Amendment right not to be subject to unlawful search and seizure, his privilege against self-incrimination under the Fifth Amendment, his right to due process under the Fourteenth Amendment, and his right to counsel under the Sixth Amendment.   The Supreme Court rejected each of these claims.

In addressing the petitioner's Fourth Amendment unlawful search and seizure claim, the Court in Schmerber recognized that "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State."   Id. at 767.   The Court held, however, that the police officer's conduct in requiring the petitioner to submit to a blood test in a hospital environment did not violate his constitutional rights to be free of unreasonable searches and seizures.   The Court stated:

> [T]he questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness.
>
> In this case, as will often be true when charges of driving under the influence of alcohol are pressed, these questions arise in the context of an arrest made by an officer without a warrant.   Here, there was plainly probable cause for the officer to arrest petitioner and charge him with driving an automobile while under the influence of intoxicating liquor.   The police officer who arrived at the scene shortly after the accident smelled liquor on petitioner's breath, and testified that petitioner's eyes were 'bloodshot, watery, sort of a glassy appearance.'   The officer saw petitioner again at the hospital, within two hours of the accident.   There he noticed similar

symptoms of drunkenness. He thereupon informed petitioner 'that he was under arrest and that he was entitled to the services of an attorney, and that he could remain silent, and that anything that he told me would be used against him in evidence.'

While early cases suggest that there is an unrestricted 'right on the part of the government always recognized under English and American law, to search the person of the accused when legally arrested, to discover and seize the fruits or evidences of crime,' . . . the mere fact of a lawful arrest does not end our inquiry. . . . The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions [beyond the body's surface] on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

Although the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of a test of petitioner's blood for alcohol, the question remains whether the arresting officer was permitted to draw these inferences himself, or was required instead to procure a warrant before proceeding with the test. Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned. . . .

The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence,' <u>Preston v. United States</u>, 376 U.S. 364, 367, 84 S. Ct. 881, 883, 11 L. Ed. 2d 777. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

Similarly, we are satisfied that the test chosen to measure petitioner's blood-alcohol level was a reasonable one. Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of

alcohol.   See Breithaupt v. Abram, 352 U.S., at 436, n.3, 77 S. Ct. at 410, 1 L. Ed. 2d 448.   Such tests are a commonplace in these days of periodic physical examination and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.   Petitioner is not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as the 'Breathalyzer' test petitioner refused, see n. 9, supra.   We need not decide whether such wishes would have to be respected.

Finally, the record shows that the test was performed in a reasonable manner.   Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment-for example, if it were administered by police in the privacy of the stationhouse.   To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.

We thus conclude that the present record shows no violation of petitioner's right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures.

Schmerber, 384 U.S. at 768-72.

In the present case, the Court likewise must determine whether the police officer's conduct in requiring Plaintiff to submit to blood and urine tests was justified under the circumstances and whether the means and procedures employed in taking the blood and urine samples were reasonable.   Here, Officer Taylor observed Plaintiff speeding out of a driveway onto a highway at 3:30 a.m.; he pulled Plaintiff over and smelled alcohol on Plaintiff when he approached his door; he observed an almost-empty twelve-pack of beer in the car; and he saw Plaintiff put something in his mouth that appeared to be a bag of cocaine and swallow it.   Officer Taylor attempted to retrieve the bag from Plaintiff's mouth and, unable to do so, placed Plaintiff under arrest and took him directly to the emergency room of Thomas Hospital.

Based on these facts, which established arguable probable cause to arrest Plaintiff for reckless driving and driving under the influence, there was a clear indication that evidence of a crime would be found and that such evidence might disappear unless there was an immediate search. Like the officer in <u>Schmerber</u>, Officer Taylor could have reasonably believed that he was confronted with an emergency in which the delay necessary to obtain a warrant threatened the destruction of evidence, namely, the level of cocaine and alcohol in Plaintiff's blood and urine.[25] Therefore, the attempt to secure that evidence in this case "was an appropriate incident to [Plaintiff's] arrest." <u>Id.</u> at 771.

Furthermore, as in <u>Schmerber</u>, the tests chosen to measure Plaintiff's drug and alcohol levels in this case were reasonable, and there is no evidence that Plaintiff requested any other form of testing and was refused.[26] To the contrary, when Plaintiff was taken from the hospital to the jail, he was offered a breathalyzer test and refused. Further, Plaintiff's blood and urine samples were taken by a nurse in a hospital environment according to accepted medical practices, and absolutely no physical force was used in obtaining the samples. Therefore, as the Court found in <u>Schmerber</u>, "the present record shows no violation of [Plaintiff's] right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures." <u>Id.</u> at 772. <u>See also</u> <u>Sanders v. Thomas</u>, 167 Fed. Appx. 723, 725 (10th Cir. 2006) (unpublished) (police officer's conduct in taking driver to hospital for treatment and obtaining urine sample for investigatory purposes without driver's consent was justified under exigent circumstances doctrine where

---

25 In <u>Schmerber</u>, the Court recognized: "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." <u>Schmerber</u>, 384 U.S. at 770. In the present case, the results of Plaintiff's urinalysis were positive for cocaine (Doc. 72, att. 1 at 16); however, the results of Plaintiff's blood test do not appear in the record.

26 The <u>Schmerber</u> Court suggested that the reasonableness of the procedure might be different if the police refused to respect a reasonable request to undergo a different form of testing or responded to resistance with inappropriate force. <u>Schmerber</u>, 384 U.S. at 760 n.4. No such circumstances occurred in this case.

officer observed driver's erratic driving, and driver admitted that he "had swallowed some drugs.") (relying on Schmerber)).

Turning now to Plaintiff's claim that Defendants used excessive force in obtaining the blood and urine samples, "excessive force claims under the Fourth Amendment refer to unreasonable force or physical contact exerted by law enforcement agents in the context of arrests, investigatory stops, and seizures of people." Crosby v. Paulk, 187 F.3d 1339, 1351 (11th Cir. 1999). It is undisputed in this case that no physical force or restraint was used by Defendants in extracting the blood and urine samples from Plaintiff. (Doc. 132 at 6). Although Plaintiff objected to the tests, he offered no physical resistance, and the samples were withdrawn without the use of force. (Id.). Therefore, Plaintiff's excessive force claim is completely without merit. Accordingly, for each of the foregoing reasons, Plaintiff's Fourth Amendment unlawful search and seizure claims based on Defendants' withdrawal of blood and urine samples at the hospital without his consent fail as a matter of law.

D. Claims Against Remaining Defendants .

Having found no constitutional violation in this case by Defendants Taylor, Morgan, Gilheart, Banks, or Olds, Plaintiff cannot establish municipal liability on the part of the City of Fairhope or supervisory liability on the part of Police Chief Mike Comalander, Mayor Tim Kant, Director Phillip Kousa, or Thomas Hospital for having caused the constitutional violation at issue through their policies and customs or by failing to train and supervise their employees, namely, Defendants Taylor, Morgan, Gilheart, Banks, and Olds. See, e.g., Howell v. City of Lithonia, 397 Fed. Appx. 618, 621 (11th Cir. 2010) ("Because [Officer] Blackmon committed no constitutional violation, [Plaintiff] cannot show a basis on which to establish municipal liability against the City or supervisory liability against [Police Chief] Rosser.") (unpublished). Therefore, each of these

Defendants is entitled to judgment as a matter of law on Plaintiff's constitutional claims.

E. <u>State Law Claims</u>.

Having recommended the dismissal of the federal claims in this action, the undersigned declines to exercise supplemental jurisdiction over Plaintiff's state law claims. <u>See</u> 28 U.S.C. § 1367(c)(3) (providing that the court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed the claims over which it had original jurisdiction). Therefore, it is recommended that Plaintiff's state law claims be dismissed, without prejudice.

V.   CONCLUSION

Based on the foregoing, the Court concludes that Defendants are entitled to summary judgment in their favor on all federal claims asserted against them by Plaintiff. Accordingly, it is recommended that the plaintiff's motion for Extension of Time (doc. 148) be granted, that the motions for summary judgment of Defendants Benjamin Taylor, John Morgan, James Gilheart, Mike Comalander, Timothy Kant, Nurse Gloria Jean Williams (a/k/a Gloria Banks), and Dr. Rolland Olds (Docs. 67, 69, 70, 72, 92, 126, 127, 135, 137, 138, 139, 143) be granted, that Plaintiff's federal claims (Counts One through Five, Eleven, Eighteen, and Twenty) (Doc. 132) be dismissed with prejudice, and that Plaintiff's state law claims (Counts Six through Ten, Twelve through Seventeen, Nineteen, and Twenty-one through Twenty-nine) (Doc. 132) be dismissed without prejudice. Having found no constitutional violation in this case, the undersigned further recommends that the remaining pending motions for discovery (Docs. 97, 118, 122, 124, 125) be denied as moot.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this 9th day of August, 2011.

/s/   Katherine P. Nelson
KATHERINE P. NELSON
UNITED STATES MAGISTRATE JUDGE

# MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

l.      ***Objection***.   Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.   Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.   *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982) (*en banc*).   The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[27] after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.   The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.   It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.   Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      ***Transcript (applicable Where Proceedings Tape Recorded)***.   Pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

/s/ Katherine P. Nelson
United States Magistrate Judge

---

[27]  Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]"   Fed. R. Civ. P. 72(b)(2).